Good morning, may it please the court. My name is Ned Smock and I represent Tuan Luong. I'm going to try to reserve two minutes for a rebuttal. Robbery has typically been viewed as an offense that is reserved to the states, and to preserve that federal-state distinction, Hobbs Act requires proof that a person affected commerce by committing the robbery that's involved. What we had in this case was a purely local robbery of a local person. There was no evidence in this case that anyone or anything tangible moved across state lines. No court, no decision from any court, whether it's this court or any other court, has ever extended federal jurisdiction to conduct that's as attenuated from interstate commerce as we saw in this case. The district court in this case repeatedly expressed misgivings about the evidence and the government's theory in this case, and also repeatedly expressed a desire to have some guidance from this court about the nature of the government's theory. Counsel, is there any case from any court holding that mere use of the Internet is not necessarily interstate commerce? We have a use of the Internet here, and I understand about the Craigslist and the locality. I'm wondering if you've identified any case from any court that have said, well, even though there was use of the Internet here, that isn't sufficient for interstate commerce. I'm not aware of any Hobbs Act case that says that. Any case, anything else? Well, the reason I say Hobbs Act is because it's important to recognize the language of the Hobbs Act statute and recognize the basis upon which the government asserted this theory that the use of the Internet and signals pinging off of servers in other states. Okay, I got that there's no cases from the Hobbs Act. I'm trying to help you here, Counsel. You don't seem to want my help. So have you got anything beyond the Hobbs Act that would suggest that mere use of the Internet is not sufficient to affect commerce? That's not sufficient proof. No, but I think the reason for that is that Hobbs Act is unique because it requires proof of an effect on interstate commerce. The cases and statutes that the government relied upon in support of its theory that a use of a means of interstate commerce is sufficient are statutes that actually discuss a sufficient jurisdictional basis being conduct that's in interstate commerce, acting in interstate commerce, use of a means of interstate commerce. And that's where there's an important distinction to make, which is that the Hobbs Act requires an effect on interstate commerce. So there's a real distinction between actually using the Internet and affecting commerce between states. And what I want to make clear is that this court actually gave guidance to the district court with the new model jury instruction that it has issued. We would not be here today had the court instructed the jury consistent with this new model jury instruction. No rational juror could have found Mr. Luong guilty based on the evidence that was presented at trial if they had applied the standard set forth in this court's model jury instruction. And I want to focus on a couple things on that point. The model jury instruction makes clear that conduct affects interstate commerce if it in any way involves, interferes with, changes or alters the movement or transportation or flow of goods, merchandise, money, or other property in commerce between or among the states. So what's that speaking to is actual movement of goods across state line, commerce, moving of merchandise, money, the existence of a signal that crossed state lines that was exclusively related to conduct within California, a transaction between two people in California, has nothing to do with the movement of goods or money across state lines. Isn't the Internet, hasn't this court held that the Internet is a channel or an instrumentality of interstate commerce? It has. Okay. But that's where I think this court's instruction has to be taken into account, which is use of a means of interstate commerce, use of the channels of interstate commerce is not the same as an effect on interstate commerce. So, for example, there are statutes like a sex trafficking statute or other statutes that speak to use of a means of interstate commerce. If you use the Internet, that establishes federal jurisdiction. That's entirely different than the Hobbs Act statute, which requires an effect. And if we look at this court's model jury instruction, which appropriately interprets the existing law on this issue, the conduct has to actually affect movement of goods across state lines, movement of money, merchandise, property. It's not speaking to signals that relate to conduct that's entirely within this state. The only case that the government cites in support of this theory is from the Seventh Circuit, the Horn case. That case first is wrongly decided, but even if it were correctly decided, you have to point to the differences between those two cases. In that case, Judge Posner spoke to eBay's relationship with interstate commerce, that it engaged in, that there were offers made across state lines. If this case had involved eBay, would this be a very different case? Would you be losing this case? I think there's a possibility. I think this is another point that I want to make very clear. I'm not asking for a bright line rule saying that use of the Internet or use of Craigslist is never sufficient to establish jurisdiction under the Hobbs Act. It's a fact-dependent inquiry, and it depends on what the defendant did. So, for example, if Mr. Luong had posted an ad on Craigslist in another state, if Mr. Luong had posted an ad for something extremely valuable for a very low price, such that it was likely that someone from another state might come to get it, we might be in a different position. But it's a fact-dependent inquiry. And what we had in this case was an advertisement for a car with 224,000 miles on it, with salvage title, posted on a site that was specifically for the San Francisco Bay Area, narrowed down to the East Bay, narrowed down to a particular city, and we saw what the natural result of that advertisement is. We saw that a person who lived 10 minutes away is the person who responded to that advertisement. The government presented no evidence that could result in a finding that there was a natural result of that local ad of creating an effect on interstate commerce. There was no evidence that anyone from another state ever looked at this advertisement. There was no evidence that anyone on an out-of-state site could have seen this advertisement when they were looking on their out-of-state site. There was no evidence that anyone looked at it from another state, or even evidence with respect to how often people look at out-of-state Craigslist sites. So we had no basis for a jury to make a finding based on this Court's instruction that there was an effect on interstate commerce. The second part of this Court's effect on interstate commerce instruction is applicable here as well. When we speak of potential effects, the way that the government interpreted that word potential and the way that the district court allowed them to proceed was to essentially say potential effect means you take this robbery and imagine hypothetical scenarios that it might have been carried out had there been a different victim or had it been carried out in an entirely different way. That's a different way of interpreting potential than this Court has allowed. Potential speaks to the natural result of the offense would be to cause an effect on interstate commerce to any degree. So it's speaking to the offense itself. It's not speaking to circumstances that might have arisen. So when you think about a robbery, there are any number of circumstances that take place during a robbery. The government's position seemed to be you take one of those circumstances, the fact that Craigslist was involved, and then you spin that out using hypothetical after hypothetical if there had been another victim. If the victim had been from another state, there was a possibility that interstate commerce could have been affected. How would you go about proving that? Would you have to call witnesses who would say, well, I was thinking of using the Craigslist to buy a car, but now I've decided not to? I mean, how would you prove, if you were the prosecution, the potential effect on interstate commerce as a natural consequence of the crime? Well, so focusing on the facts of this case, I think the government, to prove some effect on interstate commerce, might have presented evidence with respect to from Craigslist saying when news about these robberies comes about, it diminishes the number of times that people would come from another state to purchase something on Craigslist. But the problem they had is that there really was no such evidence, and the facts of this case made it absolutely clear that this was an entirely intrastate transaction carried out by a person who was seeking a buyer or a victim very nearby, and that's what he got. There was absolutely no way of finding that the natural result of this offense would result in an effect on interstate commerce. I'd like to turn to speaking about the constructive amendment of the indictment, which I think is an important point. This court reviews the district court's decision de novo, and Sterone and its progeny have said that when the grand jury is told that one particular type of commerce has been charged or been burdened by defendant's conduct, they can't then go in front of the trial jury and allege a new complex of facts, a new theory of commerce at trial. Here it's also important to remember that this jurisdictional fact is an element of the offense. It's the third element of the offense. So what we know from the government is that they went into the grand jury with a specific theory of jurisdiction to establish that third element. The government said the defendant used Craigslist. Craigslist is something that could possibly have gotten someone to come from out of state. That created this potential effect on interstate commerce. That's why there's jurisdiction. That's how we established this third element of the offense. They then came in at the second trial and presented an entirely new complex of facts, which is that after the posting of the Craigslist ad, after the robbery itself, Mr. Luong goes to an ATM machine and does balance inquiries and tries to withdraw money on one occasion. And as part of that separate act by Mr. Luong, what happened was that there were signals that were sent to servers that happened to be in other states. As part of this effort to withdraw money from a California ATM, from a California bank, and that those signals amounted to interstate commerce, and the creation of those signals somehow amounted to an effect on interstate commerce. So are you suggesting the government is required in the indictment to list the precise ways in which commerce was affected in order to validly charge the Hobbs Act effect? I thought they could simply allege that the crime itself substantially affected interstate commerce, and that would be enough, and then they would prove the method of effect on commerce at trial. That's true. But case law says that when they make a specific allegation in the indictment, it changes things. And here the government did make that specific allegation that Craigslist was the jurisdictional hook. They acknowledged that before the district court. They acknowledged before the district court that they didn't present this alternative complex of facts, and that's the problem under Sterone, that Sterone involved a very similar scenario, where there is one complex of facts presented to the grand jury and an entirely separate complex of facts and theory presented at trial. And the fact that the court did not read to the jury a specific unanimity instruction shows that if there's fault with any of these jurisdictional theories, any of the bases for establishing the third element, reversal is required. We think that every single one of these jurisdictional bases was insufficient, but any one of them would require reversal. The last thing I just want to quickly talk about is acceptance of responsibility. This was a clear legal error by the court. The guidelines allow a defendant to go to trial, do not take away acceptance points for a person to go to trial if their only reason for going to trial is challenging the application of a statute to his or her conduct. That's precisely what Mr. Luong did in this case. Mr. Luong acknowledged guilt from the beginning with respect to the actual factual elements. The opening statement involved an admission that Mr. Luong committed this robbery. Mr. Luong himself admitted guilt during his probation interview. The probation department recommended that this two-level reduction be applied. The court made an incorrect legal conclusion that a basis for denying these acceptance points was the evidentiary objections that counsel made during trial, only with respect to that one challenged element. Nothing in the guidelines says that when a defense counsel is required to simply sit on his or her hands during trial and ignore the federal rules of evidence with respect to the one factual element that they're disputing, which they're legitimately disputing under the guidelines. That's what defense counsel did in this case. Many of these objections were sustained by the court as correct interpretations of the federal rules of evidence. And taken one step further, these were all tactical decisions by me, defense counsel. Mr. Luong had nothing to do with these decisions about objecting to evidence. Mr. Luong did everything in his power to accept responsibility for these factual elements, and he should not face an extra year in prison, which is what these two points mean for him, because of evidentiary objections made by counsel at trial. I'll try to reserve a little bit of time for rebuttal. Good morning. May it please the Court, my name is Phil Kopczynski and I represent the United States. I'll begin, if I may, with the question about the Commerce Clause. Mr. Smock described this as a purely local offense, and we think that obscures the facts here. The defendant used the Internet to lure his victim. All robberies, in a sense, are local. They occur at one place in the country. That happened here. But not all robberies... ...if you rob a 7-Eleven, because we've clearly held that that affects interstate commerce, because that's an interstate undertaking. But why is it that just using Craigslist, and admittedly a local version of it, implicates the Commerce Clause? I take issue with a local version of Craigslist, but I'll get to that in a second. Even accepting that because the Internet is an instrumentality and a channel of commerce. And the fundamental legal problem with the defendant's argument is that it is a restrictive reading of the COBS Act that's not supported by the text of the statute or this Court's case law or Supreme Court case law. So how does that affect interstate commerce? Is it your argument that simply using the Internet in and of itself affects interstate commerce? Using the Internet in the way here. The Internet's a big place. I get a little leery of rules. So what kind of use of the Internet wouldn't count? If in the course of a robbery you log on to a gaming website or something, I don't know. A gaming website wouldn't have anything to do, presumably, with the robbery. If you used a GPS in the course of the robbery. So we're talking about satellites? We're talking about, yeah, if you use Google Maps. Oh, to, like, locate where to go? Ask Siri for a good escape route. Yeah, I think perhaps that would be sufficient. Yes, Your Honor. I think so. So tell me something that wouldn't be sufficient. Using the Internet. Using the Internet that would not be sufficient. So, like I say, I think it would have to be something that's relatively unrelated to commerce. Keep in mind here. But that begs the question, because we're asking you how it relates to commerce. So perhaps if... Suppose Mr. Luong had mugged somebody. Right. And then jumped in the car and realized there was a detour and uses Google Maps to plot his escape. Sufficient? I think if it's all one event, all the robbery, yes, I think that's probably sufficient. Mere use of the Internet will be sufficient. I think that's right. We don't have to ask whether it pinged off of any satellites. We don't have to ask if the servers were located in California, if they were located in Arizona or Nebraska or someplace else. All that might be relevant, but it would be icing on the cake. Well, the server location, I think, remains relevant. Here we had testimony that Craigslist has servers in Arizona. We don't know whether any of these signals actually went to Arizona, do we? We do. The Craigslist representative testified that it's a redundant server system. So the moment the defendant put the post on the for-sale website, it's in California at a server and it's in Arizona at a server. So we know for sure whether in this day and age a jury could just sort of use their common sense, what they know about the Internet, without that testimony and still rationally decide that the Internet goes over state lines. I don't know. That's maybe a closer question, but we don't have that question here. Don't you think that comes very close to federalizing almost any robbery where the Internet is used in some way? Well, no, Your Honor, I don't. I think there are a lot of robberies that you walk up to a guy on the street and put – I said where the Internet is used in any way. So you say any robbery, if the Internet is used in any way, automatically fits within the HOPs Act. Again, I'm a little leery of rules. I don't think a blanket rule is required in this case. How would we write – if we agree with you, what would our holding be in this case? How would we write it? I think the court would say that this jury could and did rationally conclude that there was an effect on interstate commerce here. Because? That's the only question. I'm sorry. Because? Because an effect on interstate commerce is a very broad thing. And Congress's commerce power – We're going to keep asking because. Because why? Because they use the Internet. Yes. So the answer is – So there are two possibilities. If you use the Internet, then that is sufficient in and of itself to give the federal government jurisdiction to prosecute the crime. To lure your victim, posting on a commerce website. Again, I don't think it has to be as broad as the Internet full stop. Maybe that's right. I just haven't spent a lot of time thinking about it. I focus on these facts here, a posting on a commerce website. Let's suppose that Mr. Luong had put this in a newspaper. And let's suppose he put it in the San Francisco Chronicle. And although his victim saw it locally, pulled it out of a box at a grocery store, the San Francisco Chronicle is shipped to other states, put in newsstands. That would be sufficient? I think it might be. I think newspapers are not a channel or instrumentality of commerce. So you'd have to have a different theory on that one. But assuming the Chronicle has a sufficient interstate circulation, it might be. Yeah, I think it could be. But, again, I think here this all goes back to the fundamental mistake in the defense argument, which is this narrowing of what commerce means. So the Supreme Court looked at this just last term in Taylor. And they said the Hobbs Act has to be read as far as Congress can go. And any other reading is not. I'm glad you brought up Taylor. And I'm sorry I didn't get a chance to ask Mr. Smock about this. But it seems like the court in Taylor is saying that because Congress regulates marijuana, that any robbery involving marijuana is a Hobbs Act robbery. Well, Congress regulates the Internet, could regulate the Internet. I don't think there's any dispute about that. So if the robbery involves the Internet, doesn't the logic of Taylor suggest that a Hobbs Act robbery that involves the Internet affects interstate commerce in the same way that marijuana sales affect interstate commerce? I think that's absolutely right. Because a marijuana sale could be a purely intrastate activity. You could grow the marijuana in California. You could sell it in California. A person could smoke it in California. Never leave California. Right? That's exactly right. But if you rob the money, it's a Hobbs Act robbery. And there was an old Second Circuit case, Needham, that Taylor cites. In that case, the Second Circuit had accepted a narrower conception of Hobbs Act jurisdiction. And they thought that the Hobbs Act, by using the word affect on commerce and putting it as an element of the offense, had somehow heightened the burden for the government. The Supreme Court overturned that case in Taylor. Similarly, there's Peterson. That's an old Seventh Circuit case. Similar logic. In that case, the Court focuses on, as Your Honor was saying, the idea that the product was purely intrastate. And in that case, the Seventh Circuit said, well, the Hobbs Act is only Category 3 of the Lopez-Morrison framework. It's only affects on commerce. It's not channels and instrumentalities. The defense makes the same argument here. Seventh Circuit accepted it in Peterson. Supreme Court overrules it in Taylor. And they say the only way to escape that conclusion would be to hold that the Hobbs Act does not exercise the full measure of Congress's commerce power. But counsel, in the marijuana context, Congress has classified that as a Schedule I drug. So Congress has really delineated and had hearings on the lack of, at least for federal purposes, medicinal purposes. We don't have a similar involvement by Congress in regulating the Internet. So I'm not sure that that analogy gets you very far. Well, I do think there's certainly federal regulation of the Internet. To the extent that the Court, the Supreme Court, I think this Court have also said that, like, congressional findings of fact at the legislative stage, that sort of thing, that doesn't really go into the Commerce Clause analysis either. Right. But it's not a crime to use the Internet, for sure. Of course not. Just as it's not a crime to have a prescription drug with a prescription. But there can be related offenses. As a federal law, it may be. The difference between this and Taylor, this case and Taylor, is this case doesn't involve a robbery of the Internet. Taylor was a robbery of the thing that was being regulated. Here, the robbery was of a person selling a car who used the Internet. This wasn't the Internet that was getting robbed. Right? So isn't that a significant distinction that would move this case outside of the holding of Taylor? I don't think it moves it outside. It's a valid distinction. But I think the reasoning of Taylor still controls. And so we see that, for example, in child pornography cases. The jurisdictional hook is that the Internet is used to facilitate the crime. Same thing here. The Internet is used to facilitate this robbery. But there isn't both a national and an international market for child porn. There's no such market here. The marijuana involved in Taylor could be considered part of the national and international market in illegal drugs. Child pornography is illegal. There's an upmarket concern that by creating demand for child pornography, that we're encouraging pornographers inside the United States and outside the United States to pull in young kids to these schemes. These are orders of magnitude away from what Mr. Luong did.  I think, again, using a site like Craigslist, and Your Honor said earlier the idea that it's a local site, that's just not accurate. What he did here, this really has no relationship to something like the flyer or the billboard at the gym or the flyer on the telephone pole. Well, if you put it on eBay, it might have been a little different case. That's Horn, the Seventh Circuit's case. Correct. eBay's a little bit different because that is a bit of a national market. There may be cars that are deliberately advertised on eBay that wouldn't be put locally on Craigslist because you were looking for a much larger market. You had an antique or a specialty car of some kind that it was cost effective to ship across the country. True. I know of no case where this court has said the line of jury rationality is in those sorts of distinctions. I think that's a— I asked Mr. Smock this question. I'll ask you sort of the same question. Let me put it in sort of different terms for the government. What's the best case that you've got from any jurisdiction suggesting that any use of the Internet affects interstate commerce, satisfies the jurisdictional hook for any purpose? Could that be Hobbs Act or something else? What's your best case? To me, it looks like our best case is Sutcliffe. Have you got something stronger than Sutcliffe someplace else? No, Your Honor. I think specifically on the use of the Internet, I don't think I do. Okay. You don't know of any court that said the universe for this is unbounded. Once you use the Internet, that involves Congress's commerce power, and Congress may exercise it to the nth degree. No. I know of no court that's put it in quite those terms because I think that would never be necessary. Horn comes close. Horn comes close. Horn, we certainly think, is directly on point. And we certainly have very broad language in our case in Sutcliffe, 2007. And I think even the cases specifically about the Hobbs Act are very broad because the Hobbs Act is broad, particularly in a modern economy where we have the Internet. The fact is that society is very interconnected now. And this goes to a second point that was argued to the jury about the way this affects interstate commerce, is that there really was a very real potential for an out-of-state buyer. There was a lot of testimony about how Craigslist is not just little, tiny communities. It is emphasis. And is that enough that if Mr. Long had received an inquiry from an out-of-state buyer, so we knew that somebody was looking at the, you know, the East Bay Craigslist, that would be sufficient because somebody else had accessed it even though his victim here was from the East Bay? I think absolutely, Your Honor. And there's no way to distinguish that sort of scenario from a case like Taylor or some older cases of this Court that talk about potential effects of the crime. In Taylor, they were trying to rob marijuana dealers. They didn't actually get any marijuana or any cash. It was a bust. But that didn't affect the analysis. Similarly, here, this easily had the potential to get an out-of-state buyer. Our victim, who the government didn't select for the trial, but it just so happened, you ask the victim and he says, oh, sure, I've sold a motorcycle to someone in Reno. When I've posted cars on Craigslist, I get inquiries from Texas, Nevada, New York, Florida. It is a very real possibility that when you put a post on a website that has 50 billion page views per month, 60 million users in the U.S. per month, that you may get interest from overstate lines. Thank you, counsel. Thank you. Butler, one minute. Thank you. I think what you're hearing from the government is that their interpretation of effect on interstate commerce with respect to use of the Internet has no limit. That limit actually does exist. It exists in the law. It exists in this Court's own model jury instruction, which is that if the use of the Internet does not involve movement or transportation of goods or money between or among states, then there is no jurisdiction. Why doesn't Taylor cover this? Explain that. Taylor involved the drug trade. There had been findings by this Court, the Supreme Court, that the drug trade necessarily involves movement of goods and money across state lines. We don't have an equivalent finding with respect to the Internet, and we have to keep this inquiry anchored to the wording of the statute. So we have lots of cases that say the Internet is an instrumentality, a channel of interstate commerce, and lots of cases that hold that when the Internet is used, it satisfies the commerce element of that particular statute, like the sex trafficking statutes, child pornography statutes, et cetera. And I don't think you can seriously contend that Congress can't regulate the Internet. I mean, there's a big debate going on now within the FCC about fair, forget the term, I'm blanking on the term, the equal access. So the government clearly regulates the Internet just like it regulates drugs. And all of that would be relevant and might be decisive if the statute were worded as the statute in Sutcliffe is worded. The statute in Sutcliffe, as with the other statutes that the government relies on, speak to conduct that's in or affecting interstate commerce, including the transfer of a document by electronic means, or the other statute involved in Sutcliffe, which involved transmitting in interstate or foreign commerce. That's not the language of the Hobbs Act. The Hobbs Act speaks to obstructing interstate commerce, not to conduct in interstate commerce. And therein lies the distinction. And so all of the cases and statutes that the government relies for its theory about use of a means of interstate commerce and use of the Internet are not decisive in this case. In fact, they go against the- We're told that Congress was legislating to the maximum extent of its power under the Commerce Clause in the Hobbs Act, right? So irrespective of those distinctions that you just drew out, if Congress is legislating to its maximum power, and Taylor says if you regulate the area, its Hobbs Act applies, it seems like you're boxed in. Well, we're not, because you can't ignore the language of the statute, and you can't ignore the Ninth Circuit's own model jury instruction on this. And if you isolate your inquiry to that, you see that there's no- It's actual or potential. Correct. Effect. Yes. Not potential use of a means of interstate commerce. It's potential effect on interstate commerce and movement of goods and money across state lines. And in the absence of that, the government must lose. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. The final case on calendar for argument today is Graham-Solt v. Klenas.
judges: Rawlinson, Bybee, Smith